# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**JULIA G. ROSA-FIGUEROA**,
    Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 18-1709 (BJM)

## OPINION AND ORDER

Julia G. Rosa-Figueroa ("Rosa") moves to reverse the Commissioner of the Social Security Administration's ("the SSA's") decision that she is not entitled to disabled widow's benefits under the Social Security Act. Rosa filed a memorandum of law in support of her position, Dkt. 13, and the government defended its decision. Dkt. 19. The case is before me on consent of the parties. Dkts. 2, 5. After careful review, the Commissioner's decision is **VACATED** and **REMANDED** for proceedings consistent with this opinion.

## STANDARD OF REVIEW

The court's review is limited to determining whether the SSA employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The agency's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). An administrative law judge ("ALJ") is a lay person who is generally unqualified to interpret "raw, technical medical data." *Berrios v. Sec'y of Health & Human Servs.*, 796 F.2d 574, 576 (1st Cir. 1986). She may not substitute her "own impression of an individual's health for uncontroverted medical opinion." *Carrillo Marin v. Sec'y of Health & Human Servs.*, 758 F.2d 14, 16 (1st

Cir. 1985). However, an ALJ may render a common-sense judgment regarding an individual's capacities, so long as she "does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when she can neither perform her prior work nor, considering her "age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). In determining whether a claimant is disabled, the SSA must consider all the evidence in the record. 20 C.F.R. § 404.1520(a)(3).

The SSA must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir. 1982). At step one, the SSA determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the SSA determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the SSA must decide whether the claimant's impairment is equivalent to an impairment already determined to be so severe as to preclude substantial gainful activity. *Id.* § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed disabled. At step four,

the SSA determines whether the impairment prevents the claimant from performing her past work. If the claimant can perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of her residual functional capacity ("RFC"), as well as age, education, and work experience. If not, then she is entitled to disability benefits. *Id.* § 404.1520(f).

The burden is on the claimant to prove that she is disabled within the meaning of the Social Security Act. *See Bowen*, 482 U.S. at 146–47 n.5. At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability. *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 5 (1st Cir. 1991). However, because Social Security disability determinations are non-adversarial proceedings, the ALJ also has a duty to "investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001) (citing *Sims v. Apfel*, 530 U.S. 103, 110 (2000)). Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the SSA has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform. *Ortiz v. Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989).

An individual seeking disabled widow's benefits must meet certain other requirements. *See* 42 U.S.C. § 402(e)(1). The same standards apply when determining whether a worker or a widow is disabled. *See id.* § 402(e)(1)(B)(i).

**BACKGROUND**

Rosa was born on July 25, 1957. Social Security Transcript ("Tr.") 1. She completed her bachelor's degree in 1980 and began working as an accountant in 1986. *Id.* at 267. Rosa developed various ailments, including rheumatoid arthritis, diabetes, gastritis, sleep apnea, hypertension, and depression. *Id.* at 67. She stopped working on April 26, 2013, explaining

that she could no longer work because she was in constant pain and could not concentrate. *Id.* at 67, 266.

Rosa applied for disability insurance benefits on May 25, 2013. *Id.* at 49. On June 4, 2013, her husband died, and she subsequently applied for widow's insurance benefits. *Id.* at 459. In both applications, Rosa claimed a disability onset date of April 26, 2013, and reported that she could not work due to rheumatoid arthritis, diabetes, hypertension, sleep disorders, and gastritis. *Id.* at 23, 49, 179, 459. Rosa's initial applications did not list depression among her impairments. *Id.* at 179, 459. However, on July 29, 2014, Rosa informed the SSA that she was "severely depressive" as of December 2013. *Id.* at 317, 322. Rosa did not initially seek treatment for her depression because, as she explained, the "best psychiatrist is our father God," and she "didn't have the intention of going to any psychiatrist or psychologist until [she] couldn't take it any longer." *Id.* at 67. In July 2014, Rosa began seeing Dr. Felix Maldonado with the Ponce School of Medicine ("Ponce School") for treatment related to depression, anxiety, insomnia, fatigue, and difficulties related to memory and concentration. *Id.* at 319.

The SSA denied Rosa's applications initially and on reconsideration. *Id.* at 82, 86. Rosa requested a hearing before an ALJ, which was held by video on September 20, 2016. *Id.* at 64. At the hearing, Rosa testified that she could no longer work because she was in constant pain, could not concentrate, and could no longer deal with numbers. *Id.* at 67. When asked what caused her limitations, Rosa named her various physical impairments and then said, "the psychiatrist told me I have anxiety. I feel depressed. I am always tired. I don't know. I don't feel I have a reason to be happy." *Id.* Rosa further explained that she spends her days watching the news and that her doctor recommended she try completing word grams because she "couldn't concentrate" and "was sort of losing [her] memory." *Id.* at 72. In describing her emotional condition, Rosa said, "I get really anxious. As I said to the doctors, I felt like the house is closing in, it's sort of getting tighter, it feels really dark,

I feel sadness, sometimes I get in a bad mood, but it's the same, because I can't do anything." *Id.* at 73. The following exchange between Rosa and her attorney also occurred:

> Q: And regarding your emotional condition, how do you feel today?
>
> A: Well, I feel very nervous and anxious, [LAUGHTER], and I feel calm because I took the pill and it calms me down.
>
> Q: And why do you laugh?
>
> A: Because of the nerves.
>
> Q: What happens, tell me.
>
> A: I am going through several situations that are very hard, and so I feel very nervous most of the time.

*Id.* at 74. After the hearing, the ALJ found Rosa not disabled. *Id.* at 37.

The ALJ found that Rosa suffers from two severe impairments—rheumatoid arthritis and non-insulin dependent diabetes—and that her mental impairment is not severe. *Id.* at 26, 30. The record she reviewed included various opinions as to Rosa's physical condition, two physical RFC assessments performed by non-examining state agency consulting physicians, and one opinion regarding Rosa's mental impairment. The record did not include a mental RFC assessment performed by an expert. The single expert opinion regarding Rosa's mental impairment consisted of a Global Assessment Functioning score (GAF) of 60 assigned by the Ponce School. *Id.* at 29. That score indicates that Rosa's major recurrent depressive disorder involved moderate symptomatology. *Id.* The ALJ gave the GAF score little weight, "considering the objective clinical findings of his [sic] outpatient visits as well as … resulting limitations." *Id.* at 30. According to the ALJ, the progress notes from the Ponce School demonstrated that Rosa "did not manifest cognitive deficiencies or thought blockages" during her outpatient visits, indicating instead that she had a "relevant and coherent thought process." *Id.* The ALJ reasoned that, although progress notes "documented symptoms of anhedonia, anxiety, depression, insomnia, decreased energy and feelings of guilt," those notes "did not report limitations in cognitive

functioning or clinical signs to support the presence of moderate symptomatology." *Id.* She thus concluded that "from a mental standpoint, at most a mild restriction is justified." *Id.* At step four, the ALJ determined that Rosa can perform light work, including her prior work as an accountant. *Id.* at 37. The ALJ included various physical limitations in her RFC finding and no mental limitations. *Id.* at 32.

Rosa sought review with the Appeals Council, which denied her request, making the ALJ's decision the SSA's final decision.[1] *Id.* at 1, 17, 43. She then filed the instant complaint, seeking federal district court review of the ALJ's disability determination. Dkt. 1.

**DISCUSSION**

Rosa argues that the ALJ's decision regarding her mental impairment was not supported by substantial evidence because the ALJ improperly interpreted raw medical data, failed to seek an expert mental RFC assessment, failed to include any mental limitations in her RFC, and improperly concluded that she could perform her work as an accountant, which is a mentally demanding occupation. The government responds that the ALJ was under no obligation to seek additional information regarding Rosa's mental impairment and that the ALJ did not improperly interpret raw medical data because the findings of Rosa's mental health examiners were easily understood by lay persons.

An ALJ is a lay person who is generally unqualified to interpret "raw, technical medical data." *Berrios*, 796 F.2d at 576. In other words, an ALJ generally needs a medical expert to translate medical evidence into functional terms. *Vega-Valentín v. Astrue*, 725 F. Supp.2d 264, 271 (D.P.R. 2010). "[A]n expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Manso-Pizarro*, 76 F.3d at 17–18 (citing *Santiago*, 944 F.2d at 7);

---

[1] The Appeals Council denial addresses Rosa's application for disabled widow's benefits and explains that a separate letter will issue related to her application for disability insurance. Tr. 1. As such, review here is limited to her application for widow's benefits.

*see also Gordils*, 921 F.2d at 329; *Rivera-Figueroa v. S.H.H.S.*, 858 F.2d 48, 52 (1st Cir. 1988) (citing *Burgos Lopez v. Sec'y*, 747 F.2d 37, 41–42 (1st Cir. 1984)) ("Absent a residual functional capacity assessment from an examining psychiatrist," an ALJ is generally not "equipped to conclude that [a] claimant's condition [presents] no significant limitation on ability to work."); *Rosado v. Sec'y of Health & Human Servs.*, 807 F.2d 292, 293–94 (1st Cir. 1986) (citing cases) ("By disregarding the only residual functional capacity evaluation in the record, the ALJ in effect has substituted his own judgment for uncontroverted medical opinion. This he may not do.").

Here, the ALJ had the benefit of a single expert opinion: a GAF score of 60. The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate the social, occupational, and psychological functioning of adults. "The GAF rating system ... is not raw medical data; rather, the system provides a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *González-Rodríguez v. Barnhart*, 111 Fed.Appx. 23, 25 (1st Cir. 2004) (per curiam) (unpublished) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). A score of 60 "indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Negron v. Colvin*, No. CIV. 13-1926 CVR, 2015 WL 1499144, at *4 n.4 (D.P.R. Apr. 1, 2015); *see Echandy-Caraballo v. Astrue*, Civ. No. CA 06-97 M., 2008 WL 910059, at *4 n.7 (D.R.I. Mar. 31, 2008) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000). The ALJ in Rosa's case afforded little weight to the Ponce School's GAF score, finding that, although progress notes indicated Rosa suffered from "anhedonia, anxiety, depression, insomnia, decreased energy and feelings of guilt," those notes "did not report limitations in cognitive functioning or clinical signs to support the presence of moderate symptomatology." *Id.*

After offering the GAF score little weight, the ALJ had before her a record consisting of Rosa's medical records themselves. She did not have the benefit of a mental RFC assessment performed by a psychologist or psychiatrist. Thus, her conclusions regarding the extent of Rosa's mental limitations can only be supported by substantial evidence if they would be obvious to a lay person. That is not the case.

The record evidence related to Rosa's mental impairment consists of progress notes, evaluations, treatment plans, and appointment records from the Ponce School. Rosa first sought mental health treatment on July 9, 2014 after her rheumatologist advised her to seek mental health help. Tr. 18. Doctors at the Ponce School diagnosed Rosa with moderate recurrent major depressive disorder. *Id.* at 498. At Rosa's initial evaluation, Ponce personnel noted that she was suffering from depression, crying bouts, isolation, anxiety, loss of appetite, anhedonia, lack of concentration, and insomnia or hypersomnia, although she was not suffering from perception disorders and was neither suicidal nor homicidal. *Id.* at 135–36. They also noted that "death" was a "stressor," assigned Rosa a GAF score of 60, and recommended a psychiatric evaluation and individual psychological therapy. *Id.* at 135–36, 147. Dr. Felix Maldonado completed a psychiatric evaluation on July 28, 2014. *Id.* at 139. He diagnosed Rosa with major depression and described the history of her illness as follows: "The patient states she is feeling sad, depressed and anxious, /illegible/. She does not sleep well and is suffering from anhedonia and anorexia. She lost 30 pounds. She has been isolated since many years ago due to her multiple illnesses. A year ago, her husband died and she has lost her skills and concentration." *Id.* Dr. Maldonado also described Rosa's speech as "normal" and "slow"; her "thought content" as "logical," "relevant," and "coherent"; and her mood as "depressed," "anxious," and "sad." *Id.* at 141. He recommended psychiatric reevaluation, RN assessment, a social worker evaluation, individual therapy with a psychologist, and treatment with various prescription medications. *Id.*

Rosa continued seeking treatment for her depression at the Ponce School at approximately three-month intervals. Records of those visits consist primarily of form progress notes containing a checklist, assessment section, and medication management section. In the checklist section, physicians describe a patient's appearance, attitude, motor activity, mood, affect, speech, cognitive difficulties, thought process, thought content, insight, judgment, and reliability by checking one of several associated boxes. *See, e.g., id.* at 133. Rosa's physicians regularly checked boxes describing her as "well-groomed," "cooperative," and "calm." *Id.* at 131, 497, 503, 505, 507. At times, they described her mood as "euthymic," at other times "anxious," and at other times "depressed." *Id.* at 129, 503, 507. Once, she was both "euthymic" and "depressed." *Id.* at 133. Frequently, physicians indicated that Rosa was not experiencing cognitive difficulties, although on July 15, 2014, she was experiencing cognitive difficulties related to "orientation." *Id.* On April 24, 2014, a physician described Rosa's judgment, insight, and reliability as "good." *Id.* at 509. On January 8, 2016, a physician described her judgment, insight, and reliability as "fair" and again assigned her a GAF score of 60. *Id.* at 503. Occasionally, the checkbox portion of these records is difficult to interpret. For instance, it is difficult to discern whether one physician intended to describe Rosa's speech as "normal" or "thought blocking." *Id.* It is also unclear whether, in describing "cognitive difficulties," that physician checked the box for "none" or "orientation." *Id.* And in a box titled "thought process," it is unclear whether she checked "intact" or "flight of ideas." *Id.* Additionally, one physician drew a long, curved line through the entire checklist. *Id.* at 509.[2]

In the portion of the form for "assessment," physicians may fill out five axes under the "DSM-IV-TR," an acronym for the Fourth Revised Edition of the *Diagnostic and Statistical Manual of Mental Disorders*. That manual, published by the American

---

[2] In explaining why the Ponce School progress notes did not support a GAF score indicating moderate symptomatology, the ALJ cited to both of the notes that are difficult to interpret, given doctors' markings.

Psychiatric Association, is "a commonly used reference book in the fields of psychiatry and psychology." *United States v. Carta*, 592 F.3d 34, 38 (1st Cir. 2010). The DSM-IV-TR uses a multiaxial assessment scheme to assist mental health care providers in diagnosing and treating their patients. *See* Victoria E. Kress et al., *The Removal of the Multiaxial System in the DSM-5: Implications and Practice Suggestions for Counselors*, 4 PROF. COUNS. 191, 193–94 (2014). Clinicians may write down codes at each axis to indicate a disorder or condition. Axis I refers to "Clinical Disorders" and "Other Conditions That May Be a Focus of Clinical Attention," Axis II refers to "Personality Disorders" and "Mental Retardation," Axis III refers to "General Medical Conditions," Axis IV refers to "Psychosocial and Environmental Problems," and Axis V refers to a patient's GAF score. *Czarnionka v. Comm'r of Soc. Sec.,* No. 12-CV-417-JL, 2013 WL 4048507, at *2 n.1–3 (D.N.H. Aug. 8, 2013) (citing *Diagnostic and Statistical Manual of Mental Disorders* (Text Revision 4th ed. 2000). Under Axis I, Rosa's doctors sometimes wrote the number 293.83, indicating a mood disorder; 296.32, indicating moderate, recurrent major depression; 311, indicating depressive disorder not otherwise specified; or "major depression, single, severe." Tr. 134, 141, 147, 178. They frequently left Axis II blank but once used the code 799.9 to indicate a deferred diagnosis and once wrote "deferred/mourning." *Id.* at 141, 147. Doctors also frequently left Axis III blank but once wrote "rheumatoid arthritis/diabetes mellitus." *Id.* at 147. Although Axis IV was also usually blank, one doctor wrote "financial issues" and another wrote "mourning/illness." *Id.* at 141, 147. Often, doctors made illegible markings in this section. *See, e.g.*, *id.* at 134, 172, 174.

In the medication management portion of the form, Rosa's physicians continued her prescriptions, most frequently for Zoloft, Ativan, and Restoril, and occasionally for Ambien. *Id.* at 129, 134, 163, 166, 170–73. Physicians also sometimes referred Rosa to a psychologist. *Id.* at 129, 168.

Some records provide further detail regarding Rosa's mental impairment. For instance, according to a prose progress note dated October 28, 2014, Rosa reported feeling

very anxious, depressed, and isolated. *Id.* at 129. She also reported that she could not tolerate noise, did not have an appetite, and had lost ten pounds. *Id.* Her physician found Rosa alert, oriented, logical, coherent, and relevant; deemed her affect appropriate; and described her mood as sad and depressed. *Id.* On January 28, 2015, Dr. Maldonado determined that Rosa suffered from anhedonia, depressed mood, anxiety, insomnia or hypersomnia, thoughts of death, lack of energy, and feelings of guilt. *Id.* at 178. He identified her weaknesses as "low self-esteem," her strengths as "support recourses [sic], condition acceptance, treatment commitment," and her "stressors" as "family problems." *Id.* Dr. Maldonado also noted that Rosa "had relapses, anxiety, fears, and concerns," that she "does not sleep well" and her "concentration has diminished." *Id.* at 177. He also described Rosa as alert, oriented, logical, coherent, and relevant. *Id.*

Based on these records, the ALJ concluded that Rosa's mental limitations were, at most, mild and that her RFC need not include any mental limitation. The government argues the ALJ could draw this conclusion without the assistance of a medical expert because these records, using terms like "cooperative," "euthymic," and "coherent," are easily understood by lay persons. It is true that lay persons attach generally accepted meanings to these terms. However, lay persons do not readily know what meaning psychiatrists and psychologists attach to these terms, particularly when those experts are evaluating an individual's mental health as it relates to "cognitive difficulties," "thought process," "speech," "thought content," "insight," or "reliability." What does it mean in terms of Rosa's mental health that she was "logical" and "coherent" on the same day that her concentration had diminished? Or that she was "alert" and "oriented" but could not tolerate noise? As lay persons, neither I nor the ALJ can know, unless an expert assists us. As the Seventh Circuit put it, "[s]evere depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it." *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995); *see also Salmond v. Berryhill*, 892 F.3d 812, 818 (5th Cir. 2018) (citing *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)

("The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability."). Even if, arguendo, the ALJ could rely on her knowledge as a lay person to interpret the checklist portion of the Ponce School progress notes, lay persons cannot readily draw conclusions about the extent of an individual's mental limitations based on the codes inserted in the DSM-IV-TR multiaxial scheme. This is particularly true where, as here, many of those codes are illegible. Nor does a psychiatrist's continued prescriptions for Zoloft, Ativan, Restoril, or Ambien make obvious the degree to which an individual suffers from a mental impairment. In short, the ALJ's conclusion regarding the severity of Rosa's mental impairment rests almost entirely on her direct interpretation of medical records, unassisted by an expert opinion. Those records do not readily reveal the extent of Rosa's mental impairment. As such, the ALJ's conclusions regarding the extent of Rosa's mental impairment are not supported by substantial evidence.

Rosa next argues that the ALJ erred in failing to develop the record because she did not seek a mental RFC assessment performed by an expert. Because Social Security disability determinations are non-adversarial proceedings, "[i]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Seavey*, 276 F.3d at 8 (citing *Sims*, 530 U.S. at 110). That duty is heightened "where there are gaps in the evidence necessary to a reasoned evaluation of the claim." *Heggarty v. Sullivan*, 947 F.2d 990, 997 (1st Cir. 1991) (quoting *Currier v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 594, 598 (1st Cir.1980)). Thus, where "a claimant has some objective symptoms [of a disabling condition], the Commissioner is required to obtain an RFC evaluation from an examining physician." *Rivera Ocasio v. Comm'r of Soc. Sec.*, 213 F. Supp. 2d 81, 83 (D.P.R. 2002) (citing *Heggarty*, 947 F.2d at 997 n. 1; *Rivera–Torres*, 837 F.2d at 6.

Here, Rosa presented evidence of objective symptoms of depression. She testified that she felt depressed, always tired, as if she did not have a reason to be happy, and as if

her house was closing in on her. Tr. 67, 73. Her treating physicians diagnosed her with depression, assigned her a GAF score of 60, and prescribed medications to treat her mental impairment. Given that Rosa suffers from objective symptoms of depression, a potentially disabling condition, the SSA was required to obtain a mental RFC evaluation conducted by an expert. Without such an assessment, the ALJ was ill-equipped to conclude, as she did, that Rosa's limitations were not debilitating.

Consequently, because the precise extent of Rosa's functional limitations is not clear from the medical evidence, I must remand to the ALJ to develop that evidence, specifically, to obtain a mental RFC assessment performed by an examining physician. The ALJ must then re-evaluate the severity of Rosa's mental impairment and her total capacity for work in light of her combined mental and physical RFC. In the process, she must fully develop the record as to all these issues.

## CONCLUSION

For the foregoing reasons, the SSA's decision is **VACATED**, and the matter is **REMANDED**. This ruling is not an opinion on the ultimate merits of Rosa's claim upon remand.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of October, 2019.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge